PIONEER BUILDING AND LOAN ASSOCIATION v. J. H. EVERHEART ET AL.

Delivered January 29, 1898.

**1. Building Associations—Application of Payments on Stock.**

A stockholder in a building and loan association has not the legal right, in the absence of an agreement to that effect, to demand that his payments on his stock shall be applied to the extinguishment of his loan debt. Following Association v. Abbott, 85 Texas, 220.

**2. Homestead—Lien for Improvements.**

Section 50, article 16, of the Constitution, prohibiting any lien on the homestead except for the price thereof or improvements thereon, does not invalidate such a lien to secure money to enable the owner of a homestead to pay for labor and material used in erecting a dwelling thereon.

### 3. Same—Application of the Money.

A lien on a homestead in favor of one who advances money to the owner to be used in paying for labor and materials used in improvements thereon is not invalidated because the borrower, for the sake of convenience, pays some of the bills for erecting the improvements out of other funds and then takes a similar amount for other business from the funds advanced for building purposes.

APPEAL from Dallas. Tried below before Hon. EDWARD GRAY.

*Morris & Crow,* for appellant.

*William Thompson* and *W. M. Edwards,* for appellees.

FINLEY, CHIEF JUSTICE. — This suit was filed by the appellant Pioneer Savings and Loan Company against the appellees Joseph H. Everheart and his wife, Annie E. Everheart, to recover on a promissory note of date August 1, 1890, for $2300, due seventy-six months after date, and payable to the National Building, Loan and Protective Union, a private corporation in the State of Minnesota, with a permit to do business in Texas, and of which appellant is the legal successor and same corporation under a change of name. The note provides for 5 per cent each of interest and premium per annum, payable on or before the last Saturday of each month, and a failure to pay either when due authorized the payee at its election to declare the principal, interest, and premium at once due. The petition alleged that December 1, 1892, there was default in such payments, and appellant afterward declared the note due; the note further provided that if collected by attorney or suit in court, for 10 per cent of attorney's fees; and there was an allegation that the note had been placed with attorneys and this suit brought. Appellant also set up it held a lien of even date with said note, given by trust deed to secure said note on a certain city lot in Dallas County, Texas, and that said lien was created and acknowledged as required by law for improving said lot of land as the homestead of the appellees, and that after said contract was so entered into, the money advanced on and represented in said note and trust deed was used to pay for the labor and material to construct a residence on said lot for the appellees, and that M. Michel, as contractor, entered into a written contract with appellant to furnish the labor and material and construct said residence, wherein it was provided appellees were first to advance and pay him $800 on said contract before appellant paid out any part of said $2300; and that said M. Michel in accordance with said contracts did furnish the labor and material and erect and construct said house and was paid therefor by appellant out of the money represented by said note and trust deed; wherefore, appellant prayed judgment for its debt, with foreclosure of its lien on said premises.

March 4, 1896, appellees filed an amended answer in lieu of their original answer, and set up a general demurrer; a special exception that ap-

pellant shows it is a nonresident corporation, and it is nowhere averred it has a permit to do business in Texas; a special exception that the M. Michel contract was not signed and acknowledged by appellee, and it does not appear upon which of the two contracts appellant seeks to re-cover; and the allegations of appellant are equivocal, inconsistent, and contradictory; a general denial, and a special answer that the contract sued upon is colorable and used as an attempt to conceal and cover the real transaction, which was a usurious contract for the borrowing and loan of money; that appellant was not to furnish any labor or material for or to erect appellee's house and did not do any of these things, and that said note and lien contract only evidenced a loan of money. Appel-lees further set up they held thirty-five shares of stock in appellant company, on which they had paid 85 cents a share per month from July, 1890, to December 1, 1892, and that said stock stood as collateral for said loan of money; that when the loan was made appellant deducted attorney's fees, valuation fees, abstract of title charges, and other expenses, amounting to $89.50, leaving the sum of $2210.50 paid over to appellees, and that these items and the stock dues, interests, and premiums paid made said contract usurious, and that all such payments amounted to $1418.25, for which they asked credit. Appellees further plead that as the contract provided that in order to prepay their loan, appellees must pay three months' installment of interest and premium on the loan in advance, as well as for the month for which settlement was made, the contract was usurious. Appellees further set up said lot of land on which foreclosure is asked is their homestead, and was when the contract herein was entered into, and that the lien of appellant is fictitious and pretended and is inhibited by the Constitution of Texas from being fixed on the homestead, and that it was formulated in an attempted evasion of the homestead laws of Texas to secure a debt created by a loan of money made by appellant to appellees; that appellees did erect such a house and used some of the money furnished by appellant, and that said house cost $3000, and was built by day labor hired by appellees and paid for by them. Annie E. Everheart set up she was a married woman, and pleaded her coverture to defeat a recovery against her.

November 23, 1896, appellant filed its first supplemental petition in reply to said answer, and set up general and special exceptions, general denial and the statute of limitations of two and four years against the recovery of payments on stock as a credit on said note and the usury statute of limitation of two years against the recovery of usury; and further, that appellees having on December 1, 1892, defaulted in the payment of their stock dues, appellant exercised the option allowed it by the contract and declared said payments on stock forfeited, and that the proceeds had been appropriated by appellant as provided in said contract.

The cause was tried before a jury, and upon the charge of the court and verdict of the jury there was judgment for appellant against J. H.

Everheart for $2462.90, and against appellant on its claim of lien. From the judgment rendered the plaintiff has appealed.

*Opinion.*—The charge of the court directed the jury to return a verdict for plaintiff against defendant J. H. Everheart for the sum of $2460, being the amount due upon the note, principal, interest, and attorney's fees, after allowing credits for the amounts paid by defendants as installments upon the thirty-five shares of stock in the loan company, and 6 per cent interest thereon from the time defendants ceased to make such payments.

It is urged by appellant that appellee was not entitled to have his stock payments allowed as credits upon the loan note, and that the charge of the court in this particular is erroneous.

At or about the time the arrangement was made for the money for which the note sued upon was executed, J. H. Everheart became a member of the loan association, taking thirty-five shares of stock therein, the par value of which was $100 per share. The certificate of stock issued to him shows that it was issued in consideration of the payment of an admission fee, and his performance of all agreements and full compliance with the terms and conditions and by-laws printed on the front and back of the certificate, which were expressly made a part of the contract. The loan company bound itself in the contract to pay Everheart $100 per share upon the stock at the end of the sixth year from the date of its issuance, payable in the manner and upon the terms and conditions and by-laws thereto attached, to which Everheart assented. The by-laws are not found in the record, nor is the certificate of stock with indorsements bodily incorporated in the record. The material conditions are said to be set forth in the statement of facts, and they are as follows:

"1. Everheart agreed to pay 60 cents a month on each share as a monthly installment; 25 cents a share for each, a quarterly and withdrawal installment—all payable the last Saturday of the month in which they fell due.

"2. A failure to make any of such stock payments when due subjected Everheart to a fine of 10 cents a share for the first month, 20 cents for the second, and 30 cents for the third. A failure to pay interest and premium when due subjected Everheart to a fine of 10 cents per $100 of his debt for the first month, 20 cents for the second, and 30 cents for the third; and if all such payments and fines were not paid within thirty days from the first delinquency, the certificate of stock was wholly to lapse and the contract cease and become null and void as to any promise or obligation of appellant, and all payments made on the stock were then to become the absolute property of appellant, and it was not to be liable for any sum under the certificate—this provision subject to the right of withdrawal provided for in the following section: When the holder of this certificate has kept it in force one year by making his payments as required and provided for he may at his election withdraw the same. This is effected by his giving appellant sixty days notice of his intention to withdraw same, and if the shares have been in force one

year and not to exceed three years, appellant shall issue to the withdrawing stockholder a certificate calling for the amount he has paid as monthly and withdrawal installments to fall due at the time his stock would have matured, if kept in force, and to draw interest at 6 per cent per annum, payable semi-annually.

"Each member of appellant may secure a loan of $75 per share by making application on his blanks, but all shares must be in force three months or have three months prepaid before a loan can be obtained. The application for a loan, made on appellant's blanks, is part and parcel of the contract with appellant. No loan can be made except to a member, and he must pledge his stock as collateral to secure his debt, and further secure with a lien on real estate.

"Negotiations and contracts concerning loans can only be made with the home office, and no agent can bind appellant in any matter or manner whatever concerning loans.

"Monthly installments belong to the loan fund to be loaned to members. The withdrawal installments go first to pay certificates of stock withdrawn and any balance to the loan fund. The quarterly installments go first to pay the expense of appellant, and any surplus to the loan fund."

It will be observed that these conditions give to the loan company the right to forfeit the stock and the installments paid thereon in case of default in the agreed payments, subject to the withdrawal provisions. By the latter provision, a stockholder who has kept up his payments for a year is given the privilege of withdrawing, and the company is required to issue him a certificate for the amount he has paid in as monthly and withdrawal installments, such certificate to be made payable at the time when his stock would have matured, and drawing interest at 6 per cent per annum, payable semi-annually. Sixty days notice of the intention to withdraw and receive such certificate is required to be given to the company by the stockholder desiring to exercise this privilege. There is no other provision made, so far as appears from the record before us, for the certificate holder to get back the money paid upon the stock, except by keeping up his payments through the six years when the stock will mature and the holder may demand a settlement. The stock in question was issued July 8, 1890, and Everheart kept up his payments to December 1, 1892, when he defaulted and paid no more after that date.

On June 28, 1893, the loan company elected to treat his stock and payments as forfeited, and notified him of this fact by letter dated August 9, 1893. He made no effort to withdraw, and receive certificate for payments made thereon. His first claim for such payments seems to have been asserted October 8, 1895, in his answer filed herein demanding that they be allowed as credits upon the debt herein sued for.

In Association v. Love, 81 Texas, 369; Association v. Abbott, 85 Texas, 220; Sweeney v. Association, 26 Southwestern Reporter, 290, and Blakeney v. Association, Id., 292, it is held, that in the absence of an

agreement to the effect that the stockholder may have his payments on stock applied to the extinguishment of his loan debt, he has no legal right to demand that such payments shall be so applied. In other words, the stipulations in the contract as disclosed by the certificate, by-laws, etc., have controlling effect upon the question.

In the case of Building and Loan Association v. Griffin, 90 Texas, 480, it was held that the stockholder was entitled to have such payments upon stock applied as credits upon his loan debt. But in the Griffin case there was an express provision in the contract providing for such application in case of foreclosure proceedings, and the decision is clearly based upon this provision. The charge of the court under the facts as presented to us is erroneous.

On the issue as to the mortgage lien given to secure the note, the jury were instructed that if they believed from the evidence that the contract was made in good faith and with the intention that the loan company should construct or cause to be constructed the dwelling house upon the homestead lot, and that the loan company did construct or cause such house to be constructed, then they should find in favor of the lien. But if they believed it was not intended in good faith that the loan company should construct or cause the house to be constructed, and that it was simply a loan of money by the said company to Everheart for the purpose of enabling the latter to build him a house upon his homestead lot, and that the lien contract was colorable only and intended to evade the homestead exemption, they should find against the lien. To express the proposition embraced in the charge in more simple terms, it in effect instructed the jury, that if money was loaned Everheart with which to build the house that the lien attempted to be given upon the house and lot to secure it would be invalid; but if the company built the house itself, or cause it to be built, that the lien would exist. The correctness of the charge rests upon the question, whether a lien upon the homestead may legally be contracted to secure money advanced for the purpose of enabling the owner of the homestead lot to pay for labor and material to be used in the erection of a dwelling house upon such homestead lot. Is it necessary to the validity of the lien that the debt should exist for the very work and material which were put into the homestead improvements, and to the specific parties furnishing such work and material? It is well established, and not here questioned, that the husband and wife may encumber the homestead with a lien to secure payment for labor and material put into improvements upon the homestead. Lippencott v. York, 86 Texas, 276. Can a third party advance the money to pay for such labor and material and have a lien directly in his favor to secure such advancement?

The Constitution exempts the homestead from forced sale, "except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon," and provides that "no mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money

therefor or improvements thereon, as herein provided, whether such mortgage or trust deed or other lien shall have been created by the husband alone or together with his wife." Const., art. 16, sec. 50. It is held that the lien must be given before the improvements are put upon the homestead in order to be valid. Lignoski v. Crooker, 86 Texas, 328. The manifest intention of the makers of the Constitution was, to authorize the voluntary incumbrance of the homestead for the purpose of erecting or improving houses thereon. A homestead lot would be of little value as a homestead, and would in fact utterly fail to serve that purpose, without appropriate buildings upon it. Hence, to equip it with proper buildings and render it capable of serving the ends contemplated by law, the owner is permitted, under certain restrictions as to his wife joining in the contract, to create a lien upon the property for such improvements. A lien given for the value of improvements which have already been placed upon the homestead would not come within the letter or spirit of the Constitution; it would be merely incumbering the homestead, already equipped for use as such, to secure an existing indebtedness created in the improvement of the homestead. In the first instance the owner is permitted to do the act for the purpose of putting the property in condition to be used as the homestead; in the second, he attempts merely to incumber the homestead already prepared for use, to secure a debt previously incurred in improving the property. It is not the character of the debt which authorizes the creation of the lien, but it is the object to be accomplished in the giving of the lien which must serve as the test of the validity of the lien. As the owner may create the lien to secure payment for labor and material to go into improvements upon the homestead, may he not give a lien upon the homestead to secure money advanced to him by another to pay for such labor and material to be put into such improvements? It is to the interest of the owner to get the best material at the least price, and the most skilled labor upon the best terms, and it may be highly to his benefit to act for himself in these matters. It may be that laborers and materialmen are unwilling to extend him credit and that he can not get the improvements made without paying cash for labor and material. Must he then be deprived of the privilege of making such improvements, because the law will not permit him to give a lien upon the homestead to secure money loaned to him to be used for these objects? It may be said that he could contract liens in favor of the laborers and materialmen, and have them assign such liens to the persons furnishing the money to secure its repayment to him. This would unquestionably be legal, and the assignee could enforce such liens upon the homestead. Why should the law give sanction to this indirect method and condemn a direct contract lien in favor of the person furnishing the money to pay for the labor and material? In each case, the object is to obtain improvements upon the homestead, and this must be accomplished by giving a lien upon the property. There is no particular form in which the lien is required by the Constitution and laws of the State to be given; it is the object to

be accomplished to which the law is directed, and we think it would be contrary to the spirit of the Constitution, and wholly unnecessary to the effectiveness of its wise and benign provisions protecting the homestead from forced sale and voluntary incumbrances, to hold that a lien could not be directly created upon the homestead for the purpose of securing money advanced to the owner to be used to pay for labor and material to go into improvements thereon. When money is obtained for that purpose, and applied to the securement of the object, we can see no principle or reason which would invalidate the lien given to secure the money. In the case under consideration, the uncontradicted evidence shows these facts:

1. The defendants, Everheart and his wife, executed their note to the plaintiff loan company for $2300, providing for interest and attorney's fees.

2. At the time of the execution of this note the parties above named entered into a written contract, by the terms of which the loan company bound itself to erect a building, dwelling-house, upon the homestead lot of defendants, and defendants agreed to pay therefor the sum of $2300. This contract recited that defendants had executed their note for this sum and a lien was given upon the lot and house to be erected thereon to secure its payment. The note referred to in this contract is the note sued on, and the lien sought to be foreclosed is alleged to be created by this contract.

3. The object of the defendants was to obtain from the loan company money with which to pay for labor and material necessary to the erection of a dwelling house upon their homestead lot. It was the purpose of the loan company to furnish the money necessary to this object, and it was fully understood by all parties that a lien should be and was given upon the property as security to the loan company.

4. About $2100 was paid to the defendant J. H. Everheart, or upon his order, in good faith upon the contract, and the greater portion of it, if not all, was by him paid for labor and material used to erect a dwelling upon defendants' homestead lot.

Upon this state of facts the court should have charged the jury that a lien existed upon the property in favor of the plaintiff to the extent of the money furnished by the plaintiff and which was by defendants used in payment for the labor and material which were put into the improvements. Loan Co. v. Paschall, 34 S. W. Rep., 1001.

The defendant testified that sometimes during the erection of the building he would pay bills for work and material out of funds from his business, and would then go and draw money from the agent of the company out of his loan fund to reimburse himself, and that the company did not know that he ever used the money in this way. The money was paid over to defendant, or on his order, in sums as needed during the erection of the building, and from time to time the progress of the building was reported to the agent, and he had inspections occasionally made to see that the building was being erected, as contemplated by the parties.

We do not regard it as necessary to the validity of the lien that every dollar of the identical money furnished by the loan company should have been directly applied to payments for labor and material. It is not an equitable but a contract lien sought to be enforced. If the money was used by the defendant in erecting the house, the fact that he paid some bills out of other funds for the sake of convenience, and then reimbursed such other funds out of the building money, would show an application of such building money to the object intended. But if any of the money furnished by the company was applied to other objects than the improvements of the homestead no lien would exist upon the homestead in favor of the loan company to secure its payment.

The judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*